**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Anant Kumar Tripati, | No.  CV 18-00066-TUC-RM |
| Plaintiff, | Consolidated with: CV 18-03313-PHX-RM |
| v. | |
| Corizon Incorporated, et al., | |
| Defendants. | **ORDER** |

Plaintiff Anant Kumar Tripati, who is currently confined in the Arizona State Prison Complex ("ASPC")-Florence, East Unit, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983.  Before the Court are Defendants Bohuszewicz and Young's Motion for Summary Judgment (Doc. 346)[1] and Defendants Arhin, Corizon, Igwe, Minev, Osinloye, Powell, Stewart, and Weigel's Motion for Summary Judgment[2] (Doc. 409.)[3]  Plaintiff opposes Defendants Bohuszewicz and Young's Motion for Summary Judgment (Doc. 411), but he failed to respond to Defendants Arhin, Corizon, Igwe, Minev, Osinloye,

---

[1] Defendant Shuman joins in the Motion for Summary Judgment.  (Doc. 403.)

[2] Defendants Centurion of Arizona, LLC, Igwe, Powell, Osinloye, Minev, Stewart, and Weigel also join in the Motion for Plaintiff's claims/allegations that occurred after Centurion took over as the Arizona Department of Corrections' ("ADC") contracted healthcare provider on July 1, 2019.  (Doc. 415.)

[3] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response.  (Docs. 348, 412.)

Powell, Stewart, and Weigel's Motion for Summary Judgment, and the time to do so has expired. Also before the Court are several motions filed by Plaintiff.[4]

## I.    Background

In his Second Amended Complaint, Plaintiff sued several Corizon and Arizona Department of Corrections ("ADC") officials. (Doc. 42.) On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment medical claim against Defendants Babich, Corizon, and Ryan in his official capacity only ("Corizon Defendants") in Count One and a First Amendment mail claim against Defendants Osler, Schletter, Moreno, and Ramos ("ADC Defendants") in Count Three. (Doc. 41.) The Court directed these Defendants to answer and dismissed the remaining claims and Defendants. (*Id.*)

Defendant Ryan subsequently retired from the ADC, so the Court substituted current ADC Director David Shinn for Ryan as a Defendant in his official capacity only and dismissed Ryan from the action. (Doc. 228.)

Subsequently, the Court consolidated this action with Plaintiff's lawsuit in case number 18-CV-3313-PHX-JJT (JFM) and added several claims and Defendants. (*See* Doc. 261.) Specifically, upon screening Plaintiff's Third Amended Complaint in CV 18-3313 pursuant to 28 U.S.C. § 1915A(a), the Court determined that, liberally construed, Plaintiff stated the following claims: (1) an Eighth Amendment medical care claim in Count One against Defendants Corizon, Stewart, Arhin, Minev, Powell, Osinloye, Weigel, Igwe, Shuman, and Centurion regarding their alleged failure to treat Plaintiff's high blood, pressure, heart condition, and COPD; (2) an Eighth Amendment medical care claim in Count One against Defendants Young, Bohuszewicz, and Shuman regarding their alleged failure to provide Plaintiff a low-salt allergy diet; and (3) a First Amendment retaliation claim in Count One against Defendants Bohuszewicz and Shuman for allegedly filing a

---

[4] The Court will address any remaining pending motions that were not addressed herein in a separate Order.

false disciplinary report against Plaintiff for filing administrative grievances. (Doc. 45 at 18 and Doc. 60 in CV 18-3313.)

On September 3, 2020, the Court granted summary judgment to Defendants Shinn, Corizon, Babich, Osler, Schletter, Moreno, and Ramos as to Plaintiff's claims against them in the original action. (Doc. 371.)

Consolidated Defendants Bohuszewicz, Young, and Shuman now move for summary judgment and argue that Plaintiff failed to exhaust available administrative remedies. (Docs. 346, 403.) Consolidated Defendants Arhin, Igwe, Minev, Osinloye, Powell, Stewart, Weigel, Corizon, and Centurion also move for summary judgment and argue that they were not deliberately indifferent to Plaintiff's serious medical needs. (Docs. 409, 422.)

## II. Plaintiff's Motions

### A. Rule 56(d) Motion

In his "Motion re: Rule 56(d)," Plaintiff asks the Court to defer his response to Defendants Bohuszewicz and Young's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(d) until he receives certain documents from Defendants, including e-mails sent by Defendant Bohuszewicz and other correctional officers, copies of Plaintiff's complaints concerning Defendant Bohuszewicz destroying his grievance records or prohibiting him from using the grievance process, and copies of complaints from other inmates concerning Defendant Bohuszewicz destroying grievance records. (Doc. 351.)

Rule 56(d) provides that if a non-movant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the Court may: defer considering the motion, allow time to obtain affidavits or take discovery, or issue and any other appropriate order. But the party seeking relief under Rule 56(d) must show: (1) that they have set forth in affidavit the specific facts they hope to elicit from further discovery, (2) the facts sought exist, and (3) that these sought after facts are essential to resist the motion for summary judgment. *State of Cal., on Behalf of California Dep't of*

*Toxic Substances Control v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998). The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment. *Conkle v. Jeong*, 73 F.3d 909, 914 (9th Cir. 1995).

In this case, Plaintiff has not made the necessary showing for relief under Rule 56(d). Plaintiff states that he needs the requested documents to show that an administrative remedy was not available to him. But Plaintiff could have presented this evidence by filing an affidavit based on his personal knowledge. The documents Plaintiff seeks are not essential to resisting Defendant Bohuszewicz and Young's Motion for Summary Judgment. Therefore, the Court will deny Plaintiff's "Motion re: Rule 56(d)."

### B. Rule 11(c)(2) Motion

Plaintiff seeks sanctions against defense counsel pursuant to Federal Rule of Procedure 11(c)(2) for "failure to conduct reasonable inquiry" into Plaintiff's claims. "Rule 11 is an extraordinary remedy, one to be exercised with extreme caution." *Operating Engineers Pension Trust v. A-C Co.*, 859 F.2d 1336, 1345 (9th Cir. 1985). Thus, sanctions under Rule 11 are "reserve[d] for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose." *Id.* at 1344. The record in this case does not support such a finding, and Plaintiff's vague assertions are insufficient to support Rule 11 sanctions. Accordingly, this Motion will also be denied.

### C. Motion to Vacate

Plaintiff moves to vacate the Court's September 3, 2020 Order (Doc. 371) granting summary judgment to Defendants Shinn, Corizon, Babich, Osler, Schletter, Moreno, and Ramos pursuant to Federal Rule of Civil Procedure 59; the Court construes this as a Motion for Reconsideration. (Doc. 383.) In the September 3, 2020 Order, the Court determined that these Defendants were not deliberately indifferent to Plaintiff's hypertension, chronic pain, and asthma/lung condition and that they did not violate Plaintiff's First Amendment legal mail rights or right to access the courts. (Doc. 371.)

The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence. Any such motion shall point out with specificity the matters that the movant believes were overlooked or misapprehended by the Court, any new matters being brought to the Court's attention for the first time and the reasons they were not presented earlier, and any specific modifications being sought in the Court's Order. No motion for reconsideration of an Order may repeat any oral or written argument made by the movant in support of or in opposition to the motion that resulted in the Order. Failure to comply with this subsection may be grounds for denial of the motion.

LRCiv 7.2(g)(1). "Absent good cause shown," a motion for reconsideration must be filed "no later than fourteen (14) days after the date of the filing of the Order that is the subject of the motion." LRCiv. 7.2(g)(2).

Plaintiff's motion for reconsideration is untimely, and Plaintiff has not shown that reconsideration of the September 3, 2020 Order is warranted. Plaintiff merely rehashes the same arguments regarding Defendants allegedly submitting falsified evidence that he made at summary judgment and that he has repeatedly made throughout this action. Absent a showing of manifest error or a change in law that could not have been brought to the Court's attention at summary judgment, Plaintiff's Motion will be denied. As such, the Court will also deny Plaintiff's "Notice in Support of Pending Matters" (Doc. 388) that he filed in support of the Motion for Reconsideration.

### D.      Notice of Retaliatory Block

In this Motion, Plaintiff alleges that he has effectively been banned from filing administrative grievances through prison officials' practice of extending the time to respond to Plaintiff's grievances; Plaintiff asks the Court to order that this "retaliatory block be ordered stopped." (Doc. 430.) The Court will construe this as a motion for injunctive relief.

A plaintiff seeking a preliminary injunction must show that (1) he is likely to

succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Here, Plaintiff has not discussed any of the *Winter* factors. Moreover, "[w]hen a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015); *see De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (preliminary injunctive relief is inappropriate for matters "lying wholly outside the issues in the suit"). The allegations in Plaintiff's Motion arise from events distinct from his claims that are before the Court. Therefore, he is not entitled to the relief sought.

An exception to this rule arises where the injunctive relief sought is related to access to the courts. *See Prince v. Schriro, et al.*, CV 08-1299-PHX-SRB, 2009 WL 1456648, at *4 (D. Ariz. May 22, 2009) (where the relief sought relates to a prisoner's access to the court, "a nexus between the preliminary relief and the ultimate relief sought is not required[,]" and the court need not consider the merits of the underlying complaint) (citing *Diamontiney v. Borg*, 918 F.2d 793, 796 (9th Cir. 1990)). The constitutional right of access to the courts encompasses a right to litigate without active interference. *See Silva v. Di Vittorio*, 658 F.3d 1090, 1102 (9th Cir. 2011), *overruled on other grounds by Richey v. Dahne*, 807 F.3d 1202, 1209 n.2 (9th Cir. 2015). But even if the Court construes Plaintiff's allegations in the motion for injunctive relief as an access-to-courts claim, Plaintiff's request for injunctive relief still fails. To maintain an access-to-courts claim, a prisoner must submit evidence showing an "actual injury" resulting from the defendant's actions. *Lewis v. Casey*, 518 U.S. 343, 349 (1996). With respect to an existing case, the actual injury must be "actual prejudice . . . such as the inability to meet a filing deadline or to present a claim." *Id*. at 348-49. Plaintiff has failed to show a likelihood of success on the merits or irreparable injury as it pertains to an access-to-courts claim. There is no evidence that Plaintiff has faced an unreasonable delay or the inability to file anything in this action. A review of the docket in this matter reflects that Plaintiff has filed numerous motions and

notices to the Court. Plaintiff has not shown that his ability to litigate this or any other case has been impeded. Plaintiff has not been prevented from bringing a claim as a result of the alleged conduct. Thus, Plaintiff has not established actual injury. Plaintiff has also failed to satisfy the remaining requirements that must be shown to warrant injunctive relief. *See Winter*, 555 U.S. at 20. For the foregoing reasons, the Court will deny Plaintiff's motion for injunctive relief.

### E. Motion for Expedited Decision on SDT and Discovery Conference-Motion to Stay and Motion to Review Documents

In this Motion, Plaintiff asks the Court to issue a subpoena duces tecum ("SDT"), direct production of emails from Defendants, stay these proceedings for 90 days, and allow leave to amend. (Doc. 411.) In an Order dated January 8, 2021, the Court denied Plaintiff's request for an SDT and his request for production of e-mails. (Doc. 428.) Further, the Court finds no basis for staying this action or allowing Plaintiff to amend the complaint at this late stage of the proceedings. Accordingly, this Motion will be denied.

In his Motion to Review Documents, Plaintiff asks the Court to conduct an *in camera* review of e-mails referenced in Defendants' privilege log. (Doc. 414.) The emails at issue were exchanged between Bohuszewicz and Kelley Dudley, who Defendants aver is "the primary legal liaison between the Arizona Department of Correction Rehabilitation & Reentry and the Arizona Attorney General's Office." (Docs. 414, 421.) Defendants aver that the emails were created in "within the scope of the attorney-client relationship and in preparation for litigation." (Doc. 421.) Plaintiff does not dispute that averment, but he argues that the documents are not privileged because Dudley was a "conduit" and Bohuszewicz "would have given a substantially similar response without" Dudley. (Doc. 427.) The cases relied on by Plaintiff do not support his position that the emails are non-privileged, and this Motion will be denied.

### F. Motion to File Delayed Motion

Plaintiff moves the Court to Order the ADC to provide documents to him, including records from the *Parsons* case, e-mails, and complaints. (Doc. 430.) The deadline for

discovery requests in this action expired on November 2, 2020. (Doc. 316.) Further, Plaintiff's request does not specify the exact documents he seeks or how they are relevant to his claims in this action. Accordingly, this Motion will be denied.

**III.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## IV. Exhaustion

### A. Legal Standard

Under the Prison Litigation Reform Act, a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

If summary judgment is denied, disputed factual questions relevant to exhaustion should be decided by the judge; a plaintiff is not entitled to a jury trial on the issue of exhaustion. *Albino*, 747 F.3d at 1170-71. But if a court finds that the prisoner exhausted administrative remedies, that administrative remedies were not available, or that the failure to exhaust administrative remedies should be excused, the case proceeds to the merits. *Id.* at 1171.

. . . .

### B. ADC Grievance Process

ADC has adopted Department Order ("DO") 802, *Inmate Grievance Procedure*, to address prisoners' complaints regarding their conditions of confinement. (Doc. 347 (Defs.' Statement of Facts) ¶¶ 7–8.) Prisoners receive a written and oral explanation of grievance procedure at initial intake and as part of the orientation process in any subsequent facility. (*Id.* ¶ 16.)

Pursuant to the version of DO 802 that was in effect when Plaintiff's claims in this action arose, prisoners must first attempt to resolve their complaints through informal means, such as discussing the issue with staff or submitting an Inmate Informal Complaint Resolution Form to their unit Correctional Officer ("CO") III; a response to the Informal Complaint must be issued within 15 workdays of receiving the Informal Complaint. (*Id.* ¶¶ 17–18, 20.)

If the prisoner is unable to resolve the issue informally, the prisoner may submit a Formal Grievance to the unit CO IV Grievance Coordinator, who will log the grievance and forward it to the Deputy Warden for response; the Deputy Warden has 15 workdays from receipt of the Formal Grievance to respond. (Doc. 347-1 at 20 (Defs.' Ex. A, Attach. 2 (DO 802 § 3.0)).)

If the prisoner is not satisfied with the Deputy Warden's response, the prisoner may submit a Grievance Appeal to the ADC Director; the Director has 30 calendar days from receipt of the Grievance Appeal to respond. (*Id.* at 21 (DO 802 § 4.0).) The Director's decision is final and constitutes completion of the non-medical grievance process. (*Id.*)

If a prisoner does not receive a timely response from the designated prison official at any point during the grievance process, the prisoner may proceed to the next stage of the grievance process the day after the response was due. (Doc. 347 ¶¶ 11, 13–14.) Extensions of the prison officials' response deadline at any step of the grievance shall not exceed 15 workdays. (*Id.* ¶ 12.)

. . . .

. . . .

### C.    Relevant Facts

#### 1.    Plaintiff's Complaints in CV 18-3313

Plaintiff filed his original Complaint in consolidated case CV 18-3313 on October 15, 2018.  (Doc. 1 in CV 18-3313.)  In Count One of the original Complaint, Plaintiff alleged that on July 16, 2018, Defendants Young and Bohuszewicz denied him his approved medical diet.  (*Id.* ¶ 45.)

Plaintiff subsequently filed a First Amended Complaint on June 24, 2019 and a Second Amended Complaint on July 29, 2019.  (Docs. 27 and 43 in CV 18-3313.)  The First Amended Complaint included the allegations against Defendants Young and Bohuszewicz regarding Plaintiff's allergy diet.  (Doc. 27 ¶ 45 in CV 18-3313.)  In the Second Amended Complaint, Plaintiff included the allegation that Defendants Young and Bohuszewicz denied his allergy diet in July 2018 and also included new allegations that in January 2019, Defendants Young, Bohuszewicz, and Shuman denied Plaintiff the medical diet that he had been on since August 2014; Plaintiff also alleged that Defendants Bohuszewicz and Shuman issued him a disciplinary ticket in retaliation for Plaintiff filing administrative grievances.  (Doc. 43 at 12, 16 in CV 18-3313.)

#### 2.    Grievance A03-069-018

On July 30, 2018, Plaintiff filed an Informal Complaint Resolution stating that the kitchen staff was not following his medical order for a lay-in tray and asking for the kitchen staff to honor the order; an Informal Complaint Response was issued on August 24, 2018 stating that the issue was unable to be resolved.  Plaintiff filed a Formal Grievance (A03-069-018) on August 24, 2018 stating that Defendant Young had changed his medical diet order; in a grievance response issued September 16, 2018, Defendant Bohuszewicz, as designee for Defendant Shuman, stated that Plaintiff's diet had not been changed because of any action by Defendant Young and that the diet had been changed because of Plaintiff's current medical needs.  Plaintiff filed a Grievance Appeal on September 18, 2018 and received a response from the Director on November 1, 2018 stating that Defendant Young

did not retaliate against Mr. Tripati and did not direct the medical staff to make changes to his diet procedures. (Doc. 347 ¶ 41.)

### 3. Grievance A03-093-018

On August 24, 2018, Plaintiff filed an Informal Complaint stating that Defendant Young was not complying with Plaintiff's diet order; an Informal Complaint Response was issued on October 4, 2018. Plaintiff filed a Formal Grievance (A03-093-018) on October 4, 2018 stating that Defendant Young and the CO IV—presumably, Defendant Bohuszewicz—were not complying with his diet order; Defendant Shuman issued a grievance response on November 16, 2018. Plaintiff filed a Grievance Appeal on November 20, 2018. (*Id.* ¶ 44.)

Plaintiff did not submit any other grievances concerning his lay-in diet order other than A03-069-018 and A03-093-018 in 2018 or 2019.

### 4. Plaintiff's 2019 and 2020 Grievance Records

Appeals Officer Rodreco Kepney reviewed the ADC Grievance Appeal log for grievances filed by Plaintiff in 2019 and 2020, and his search did not return any evidence that Plaintiff filed any grievance appeals in 2019 or 2020 concerning any alleged retaliation through issuing Plaintiff a disciplinary ticket because of his use of the grievance process or concerning Defendants Bohuszewicz and Young failing to follow Plaintiff's diet order. (Doc. 347 ¶ 34–36.)

In her review of the grievance logs, Defendant Bohuszewicz did not locate any processed or unprocessed grievances submitted by Plaintiff between January 2018 and December 2019 that pertain to the denial of a medical diet or medical diet orders by any member of the ADC staff. (*Id.* ¶ 46.) Nor did she locate any processed or unprocessed grievances submitted by Plaintiff between January 2018 and December 2019 concerning any alleged retaliation by ADC staff by issuing Plaintiff a disciplinary ticket in retaliation for his use of the grievance procedure. (*Id.* ¶ 47.)

. . . .

. . . .

**D.      Discussion**

With respect to Plaintiff's claim that Defendants Bohuszewicz and Young cancelled his medical diet order in July 2018, Defendants have met their initial burden at summary judgment of showing that there was an administrative remedy available under DO 802. Defendants have also presented evidence that Plaintiff failed to exhaust grievances A03-069-018 and A03-093-018 prior to filing this lawsuit, and therefore, failed to exhaust his claims against Defendants Young and Bohuszewicz that they denied his diet order in July 2018.   The PLRA mandates that an inmate exhaust administrative remedies *before* filing a lawsuit invoking 42 U.S.C. § 1983; exhausting administrative remedies during the course of the lawsuit does not comply with the requirement.   *Vaden*, 449 F.3d at 1050-51; *McKinney v. Carey*, 311 F.3d 1198, 1120-21 (9th Cir. 2002).   The statute itself states that "[n]o action shall be brought . . . until [the prisoner's] administrative remedies . . . are exhausted."   42 U.S.C. § 1997e(a).   Plaintiff filed his original Complaint—which included the July 2018 claim—on October 15, 2018.   (Doc. 1 in CV 18-3313.)   Plaintiff did not receive his response from the Director in grievance A03-069-018 until November 1, 2018, and he did not file his Grievance Appeal in grievance A03-093-018 until November 20, 2018.   Thus, Plaintiff was still pursuing his grievances when he filed his original Complaint and therefore failed to satisfy the PLRA requirement that a prisoner fully exhaust the grievance process before filing suit.   *See Cano v. Taylor*, 739 F. 3d 1214, 1220 (9th Cir. 2014) (holding that the date of filing an amended complaint can be used in determining whether exhaustion had occurred before filing the claim for claims not pleaded in the initial complaint, but the date of the amended complaint does not apply to unexhausted claims brought in the initial complaint).   Accordingly, Plaintiff failed to exhaust his claim that Defendants Young and Bohuszewicz denied his diet order in July 2018, and that claim will be dismissed.

Turning next to Plaintiff's claims that in January 2019, Defendants Young, Bohuszewicz, and Shuman denied Plaintiff the medical diet that he had been on since August 2014 and Defendants Bohuszewicz and Shuman issued him a disciplinary ticket in

retaliation for Plaintiff filing administrative grievances, Defendants have shown that an administrative remedy was available under DO 802 and that Plaintiff failed to complete the exhaustion process as to these claims. Accordingly, the burden shifts to Plaintiff to either show that he exhausted these claims or that the administrative remedy was effectively unavailable to him. *Albino*, 747 F.3d at 1172. The record does not support either finding.

In the Second Amended Complaint, Plaintiff asserted that he exhausted the administrative remedy for his claims in Count One. (Doc. 43 at 7.) In response to the Motion for Summary Judgment, Plaintiff argues that he "gave CO III's Bell, Smith, and Mendoza [his] grievances, which [Defendant] Bohuszewicz destroyed[.]" (Doc. 411 at 7.) Plaintiff also asserts that 15 years ago, in 2006, he "was advised by ADOC that [he] cannot appeal rejected grievances." (*Id.* at 8.) Plaintiff asserts that these facts rendered the grievance process unavailable to him. (*Id.*) In support of his argument, Plaintiff points to an Order issued in another case in which Judge Murray Snow denied summary judgment to the defendants on the issue of exhaustion after determining that there was a disputed issue of fact as to whether remedies were available to the plaintiff in that particular case. (Doc. 411-2 at 11–12 (Pl.'s Ex. 7).) Specifically, Judge Snow noted that "Plaintiff alleges that he took his grievances to Bohuszewicz, and that Bohuszewicz directly threatened him with a transfer if Plaintiff pushed the issue"; Judge Snow then concluded that "Plaintiff's allegation that Bohuszewicz directly threatened him with a transfer [was] sufficient to" create a disputed issue of fact whether an administrative remedy was available to Plaintiff. (*Id.* at 11.) But the circumstances in the present case are distinguishable from those found in the case before Judge Snow. Here, there is no evidence of Defendant Bohuszewicz making a direct threat against Plaintiff for attempting to grieve his January 2019 medical care and retaliation claims. Further, in the instant action, Plaintiff asserts that he submitted unspecified grievance documents to CO IIIs Bell, Smith, and Mendoza on an unspecified date and that Defendant Bohuszewicz destroyed them. But Plaintiff does not state that he saw the CO IIIs give the documents to Defendant Bohuszewicz, that he saw Defendant Bohuszewicz destroy the documents, or otherwise give any indication that his statements

regarding Defendant Bohuszewicz's conduct is based on his personal knowledge rather than mere speculation. Plaintiff's vague, unsupported statements are insufficient to support a finding that the administrative remedy was unavailable to him, and his attempt to import the specific factual findings regarding Defendant Bohuszewicz's conduct in a separate case to the instant matter lacks merit. Accordingly, Plaintiff's January 2019 medical care and retaliation claims will also be dismissed for failure to exhaust.

## V. Medical Claim

### A. Legal Standard

To succeed on a § 1983 medical claim, a plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice"

do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

### B. Relevant Facts[5]

On February 16, 2016, Plaintiff was seen by Dr. Ahmadieh at Valley Neurologic Clinic for complaints of fluctuating blood sugar and blood pressure; Dr. Ahmadieh opined that the fluctuations were due to autonomic dysfunction, which is a dysfunction of the nerves that regulate nonvoluntary body functions such as heart rate, blood pressure, and sweating. (Doc. 410 (Defs.' Statement of Facts) ¶ 3.)

On May 23, 2016, Plaintiff saw Nurse Practitioner ("NP") Burns onsite and reported that he wanted to refuse all medical care and stop all medications. (*Id.* ¶ 5.) Thereafter, Plaintiff refused all medical treatment, including medications, labs, chronic care visits, and offsite consults until July 3, 2017. (*Id.* ¶ 6.)

On July 14, 2017, Plaintiff saw Dr. Ngwube onsite for chronic care related to asthma, hypertension, and a heart murmur, and Dr Ngwube noted that Plaintiff had been refusing medications for over a year. (*Id.* ¶ 7.) Dr. Ngwube also noted that Plaintiff had undergone chest x-rays the day before, and the results were "negative." (*Id.*) Dr. Ngwube

---

[5] Because Plaintiff did not file separate or controverting statements of facts in response to Defendants Arhin, Corizon, Igwe, Minev, Osinloye, Powell, Stewart, and Weigel's Motion for Summary Judgment, as required by the Local and Federal Rules of Civil Procedure, the Court will draw the relevant facts primarily from Defendants' Statements of Facts and accompanying exhibits. (Doc. 410.) The Court will consider Defendants' facts as undisputed unless it is clear from the record evidence, including the allegations in the verified Second Amended Complaint (Doc. 43 in CV 18-03313)—which the Court construes as an affidavit in opposition to the Motion for Summary Judgment— that there is a dispute. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (allegations in a pro se plaintiff's verified pleadings must be considered as evidence in opposition to summary judgment); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence).

prescribed an albuterol inhaler, four time daily as needed, as well as Lisinopril for high blood pressure. (*Id.*) On July 16, 2017, Plaintiff refused his Lisinopril dose. (*Id.* ¶ 8.)

On August 8, 2017, Plaintiff saw Dr. Baird onsite for several issues including nocturnal urination, allergies, GERD, constipation and "the shakes." (*Id.* ¶ 9.) Plaintiff requested to be put back on Doxazosin (high blood pressure), Finasteride (enlarged prostate), Omeprazole (GERD), and Senna (constipation). (*Id.*) Dr. Baird prescribed Finasteride, Loratadine (allergies), and Omeprazole, and ordered weekly blood pressure checks for 30 days; he also ordered an evaluation for neuropathy by the onsite provider in response to Plaintiff's request for Gabapentin. (*Id.*)

On September 6, 2017, Plaintiff saw Defendant NP Weigel onsite for complaints of pain in the bottom of his feet, as well as in his back, knees, left neck to head, thumb, and hands. (*Id.* ¶ 10.) Plaintiff reported that he could not take NSAID pain relievers. (*Id.*) Defendant Weigel ordered cervical and lumbar x-rays; the lumbar study was normal, and the cervical study was normal save for some "C spine straightening." (*Id.*) NP Weigel assessed Plaintiff with cervicalgia, or neck pain; prescribed Flonase (allergies) and Amlodipine Besylate (high blood pressure); and ordered a rheumatoid panel, which was normal. (*Id.*)

On September 23, 2017, Plaintiff saw Defendant Weigel onsite for follow-up on his blood pressure and an evaluation for possible Gabapentin. (*Id.* ¶ 11.) Defendant Weigel noted that Plaintiff was on blood pressure checks for two weeks, with results showing that his blood pressure was not well controlled. (*Id.*) Defendant Weigel reviewed Plaintiff's nerve conduction studies which showed no evidence of peripheral neuropathy, radiculopathy, plexopathy or mononeuropathy; she also reviewed Plaintiff's recent x-ray results. (*Id.*) Defendant Weigel prescribed Doxazosin Mesylate (high blood pressure), Hydrochlorothiazide (high blood pressure), and a higher dosage of Lisinopril (high blood pressure; thus, at the time, Plaintiff was on four blood pressure medications: Lisinopril, Amlodipine Besylate, Doxazosin Mesylate and Hydrochlorothiazide. (*Id.*)

On October 11, 2017, Plaintiff saw Defendant NP Igwe onsite and requested to be placed on Enalapril, Flonase, Prednisone, and Zyrtec. (*Id.* ¶ 12.) Defendant Igwe explained to Plaintiff that Enalapril is in the same class as Lisinopril, so ordering Enalapril would be duplicative; she also explained that Prednisone is not indicted for hypertension; it is indicated on a short-term basis for severe allergies. (*Id.*) Defendant Igwe increased Amlodipine to 5 mg daily, and Cetirizine to 10 mg daily, and she ordered continued daily blood pressure checks. (*Id.*)

On December 7, 2017, Plaintiff saw NP Kary onsite for complaints of worsened asthma symptoms, hypertension, a dry cough, and intermittent chest pain. (*Id.* ¶ 13.) At the time, Plaintiff was on Finasteride, Doxazosin Mesylate, Hydrochlorothiazide, Amlodipine, Lisinopril, Cetirizine, albuterol inhaler, and Omeprazole. (*Id.*) NP Kary prescribed Aspirin, Clondine (high blood pressure), and Senna; she believed that Lisinopril might be the reason for Plaintiff's cough, so recommended that it be weaned. (*Id.*) She also ordered daily blood pressure checks. (*Id.*)

On January 8, 2018, Plaintiff had a follow-up with NP Kary for elevated blood pressure and chest pains. (*Id.* ¶ 14.) Plaintiff stated that his blood pressure would remain high as long as his pain was not managed, and he requested Gabapentin and Prednisone for intermittent pain, shakes, and spasms; Plaintiff also reported that he took his inhaler once a day, but he did not feel like waiting in the pill line for his second inhaler dose. (*Id.*) NP Kary noted a normal physical examination and prescribed analgesic balm for back pain, Tizanidine for muscle spasms, increased Hydrochlorothiazide to twice daily, and ordered a chest x-ray and continued daily blood pressure checks with Clonidine as needed. (*Id.*)

Plaintiff had another appointment with NP Kary on February 1, 2018, and Plaintiff reported that he took Tizanidine for two days and experienced more muscle spasms. (*Id.* ¶ 15.) NP Kary reviewed the chest x-rays, and the results showed peribronchial cuffing compatible with asthma and bronchitis. (*Id.*) NP Kary ordered nasal spray for allergies and a repeat chest x-ray in two weeks and informed Plaintiff that he needed to take his inhaler twice daily instead of once. (*Id.*)

On February 19, 2018, Plaintiff saw NP Kary again and reported that he had been refusing Lisinopril and Hydrochlorothiazide due to the "manner in which they were given." (*Id.* ¶ 16.) NP Kary noted that Plaintiff's blood pressure was within normal limits when he was taking his medications and that it increased after he stopped Hydrochlorothiazide and Lisinopril. (*Id.*) NP Kary changed the medication administration times so that Plaintiff would take Hydrochlorothiazide in the morning and Lisinopril in the evening. (*Id.*)

Plaintiff refused his Hydrochlorothiazide from February 21, 2018 through May 1, 2018. (*Id.* ¶ 17.)

Plaintiff saw NP Kary on March 1, 2018 with complaints of stomach muscle cramps and spasms while taking Hydrochlorothiazide and Lisinopril and that once he stopped taking both, he felt better. (*Id.* ¶ 18.) NP Kary reduced Hydrochlorothiazide to 25mg every morning and ordered continued daily blood pressure checks. (*Id.*)

On April 19, 2018, Plaintiff saw NP Kary for medication noncompliance; Plaintiff reported ongoing refusal of his blood pressure medications because they caused nighttime voiding. (*Id.* ¶ 19.) NP Kary discontinued Hydrochlorothiazide and Lisinopril and prescribed Losartan Potassium instead, in addition to continued daily blood pressure checks. (*Id.*)

On May 15, 2018, NP Kary increased Plaintiff's Losartan Potassium dose. (*Id.* ¶ 20.)

On May 21, 2018, Plaintiff saw NP Kary with complaints of intermittent shortness of breath, chills, fever, shaking, and trembling legs. (*Id.* ¶ 21.) NP Kary ordered chest x-rays, which showed peribronchial cuffing, similar to the February 13, 2018 x-ray. (*Id.*) NP Kary planned to increase Losartan further if Plaintiff's blood pressure continued to be elevated. (*Id.*)

On May 30, 2018, Plaintiff saw NP Kary again; NP Kary reviewed Plaintiff's most recent chest x-rays, and the results were compatible with asthma and bronchitis. (*Id.* ¶ 22.) NP Kary prescribed a Ciclesonide inhaler and increased Losartan. (*Id.*)

On June 25, 2018, Plaintiff returned to NP Kary with reports of pain, shakes, tremors, and shortness of breath; NP Kary prescribed Methocarbamol (muscle relaxant), ordered another chest x-ray, and planned to work on pain management to try to decrease Plaintiff's blood pressure. (*Id.* ¶ 23.)

On June 27, 2018, Plaintiff refused his Methocarbamol and chest x-ray; he continued to refuse Methocarbamol through September 23, 2018. (*Id.* ¶ 24.)

On July 26, 2018, Plaintiff saw Defendant NP Osinloye for body pain and high blood pressure. (*Id.* ¶ 25.) Defendant Osinloye increased Losartan and offered options for pain medications, which Plaintiff refused; Defendant Osinloye offered Tylenol if Plaintiff changed his mind. (*Id.*)

On August 4, 2018, Plaintiff saw Registered Nurse ("RN") Hamilton for low blood pressure. (*Id.* ¶ 26.) Defendant Dr. Stewart was advised, and he verbally ordered to hold all medications except Losartan and reviewed Plaintiff's medication the next day. (*Id.*)

On August 9, 2018, Plaintiff saw Defendant Dr. Minev regarding his hypertension, and Dr. Minev noted that Plaintiff's blood pressure was still not well controlled; Dr. Minev discontinued increased Losartan. (*Id.* ¶ 27.)

On September 2, 2018, Plaintiff had a follow-up visit with Defendant Weigel, and Defendant Weigel noted that Plaintiff's blood pressure was still not well controlled, so she discontinued Losartan and re-prescribed Hydrochlorothiazide. (*Id.* ¶ 28.)

On September 15, 2018, Plaintiff saw Licensed Practical Nurse ("LPN") Mirin, and Plaintiff reported that he was refusing Methocarbamol due to a previous allergic reaction. (*Id.* ¶ 29.) Plaintiff stated that he would continue to refuse Methocarbamol until it was discontinued; Plaintiff was advised of the consequences of not taking his medication. (*Id.*) Defendant Stewart reviewed this encounter. (*Id.*)

On September 27, 2018, Defendant Dr. Arhin evaluated Plaintiff regarding his hypertension and made additional adjustments to his medication regimen. (*Id.* ¶ 30.)

On October 18, 2018, NP Hahn added Atenolol and noted that she would consider a cardiology consult if Plaintiff's blood pressure could not be brought under control. (Doc. 410 ¶ 31.)

On November 4, 2018, an Incident Command System ("ICS") was activated when Plaintiff complained of chest tightness, headache, jaw pain, and left arm numbness. (*Id.* ¶ 32.) Plaintiff was sent to the emergency room at Mountain Vista Medical Center. (*Id.*) At the hospital, Plaintiff consulted with cardiologist, Dr. Kumar, who assessed Plaintiff as follows:

> 1. Uncontrolled Hypertension
>
> Patient's blood pressure is now better controlled. He is on good antihypertensive medications in the correctional facility. The dosage however may be low. At this point the blood pressure is under control. If the blood pressure increases in the correctional facility Clonidine can be added.
>
> 2. Chest pain
>
> Patient has been ruled out for myocardial infarction (heart attack). This is an atypical chest pain. As mentioned above he had extensive workup done in the past. If he continues to have chest pain he can be sent to our office for outpatient stress myocardial perfusion imaging problem. He does not need any further in-house workup. He can be discharged back to correctional facility at the description of the hospitalist.

(*Id.* ¶ 33.) At discharge, the hospital physicians made minor adjustments to Plaintiff's existing medication dosages and added Singulair. (*Id.*)

On November 6, 2018, Defendant Igwe submitted an offsite cardiology consult request. (*Id.* ¶ 34.)

On November 20, 2018, Plaintiff saw Defendant Igwe for high blood pressure and pain; Defendant Igwe discontinued Atenolol and added Propanolol. (*Id.* ¶ 35.)

On November 26, 2018, Plaintiff reported to Defendant Igwe that he started having chest pain within three days of starting Propanolol and requested to stop inhalers because

they were not helping with his shortness of breath.  (*Id.* ¶ 36.)  Defendant Igwe discontinued Propanolol and albuterol inhalers and prescribed a nebulized albuterol inhaler.  (*Id.*)

On December 18, 2018, Plaintiff saw Defendant Igwe for chronic headaches, shakes, and tremors; Defendant Igwe prescribed Topimirate, which is used to treat nerve pain, convulsions, and chronic migraines.  (*Id.* ¶ 37.)

On December 21, 2018, Plaintiff reported that he stopped taking Topimirate after just one pill because it caused him difficulty breathing.  (*Id.* ¶ 38.)

On December 27, 2018, Defendant Igwe added Carvedilol to Plaintiff's blood pressure regimen.  (*Id.* ¶ 39.)

During a follow-up with Defendant Igwe on January 10, 2019, Plaintiff complained that the Carvedilol caused numbness, tingling, and difficulty breathing, so Defendant Igwe discontinued Carvedilol and prescribed Nifedipine.  (*Id.* ¶ 40.)

On January 16, 2019, Plaintiff informed Defendant Igwe that he had been refusing Nifedipine because it was causing him constipation.  (*Id.* ¶ 41.)  Defendant Igwe prescribed a laxative and educated Plaintiff on the importance of medication compliance.  (*Id.*)

On January 18, 2019, Defendant Igwe gave verbal orders to stop Nifedipine and restart Amlodipine.  (*Id.* ¶ 42.)

On January 22, 2019, Defendant Igwe requested an offsite cardiology consult.  (*Id.* ¶ 44.)

On February 6, 2019, Defendant Igwe changed all of Plaintiff's high blood pressure medications to keep on person and noted that the cardiology consult was pending.  (*Id.* ¶ 46.)

On March 26, 2019, Plaintiff saw Defendant Igwe and requested blood pressure medication at night and that Metoprolol be discontinued because it caused him tremors.  (*Id.* ¶ 47.)  Defendant Igwe noted that Plaintiff's blood pressure remained elevated on a daily basis and that the cardiology consult was still pending; Defendant Igwe's plan was to have blood pressure checks three times per week for 30 days, add Lisinopril, and discontinue Metoprolol and Singulair.  (*Id.*)

On April 4, 2019, Defendant Igwe submitted another cardiology consult request; Plaintiff had a follow-up with NP Brathwaite, and the plan was to discontinue Lisinopril and continue all other current medications. (*Id.* ¶ 49.) Diet, exercise, and weight control were also discussed. (*Id.*)

On April 25, 2019, Plaintiff had an offsite cardiology appointment at Goldfield Cardiovascular with Physician's Assistant ("PA") Gary Gawelko. (*Id.* ¶ 49.) An EKG taken in office showed regular rhythm. PA Gawelko noted that he could not "recommend [blood pressure] medication changes when they are very well controlled in the office." (*Id.*)

On April 30, 2019, Defendant Igwe requested an offsite treadmill stress test, but an alternative treatment plan was issued for a carotid ultrasound instead. (*Id.* ¶¶ 50–51.)

On May 24, 2019, Defendant NP Powell saw Plaintiff via telemedicine, and Defendant Powell ordered Atenolol, blood pressure checks twice a week, and Tylenol for chronic pain. (*Id.* ¶ 52.)

On May 29, 2019, Plaintiff had an offsite cardiology appointment with Dr. Kumar, and Plaintiff underwent an EKG. (Doc. 423 ¶¶ 4–5.)

Plaintiff refused Atenolol and Losartan between June 9 and June 11, 2019, stating that they caused his blood pressure to drop too low and caused him muscle cramps, trouble sleeping, confusion, fatigue, and joint pain. (Doc. 410 ¶ 53.)

On June 12, 2019, Defendant Igwe ordered an offsite cardiology consult for review of Plaintiff's most recent EKG. (*Id.* ¶ 54; Doc. 423 (Defs.' Statement of Facts) ¶ 6.)

On June 29, 2019, Plaintiff underwent a nuclear stress test and bilateral carotid doppler ultrasound with Dr. Kumar; both results were normal. (Doc. 410 ¶ 55.)

In July 2019, Defendant Igwe restarted Clonidine and Losartan and reviewed the results of the stress test and ultrasound; Defendant Igwe changed Plaintiff's medications to keep on person. (*Id.* ¶ 56; Doc. 423 ¶ 7.) In August 2019, Defendant Igwe requested another cardiology consult and had additional follow-up appointments with Plaintiff. (Doc. 410 ¶ 56.)

On July 10, 2019, Defendant Igwe reviewed the reports from the cardiology consultation with the outside cardiologist, Dr. Kumar; the tests showed no evidence of reversible ischemia, normal carotid arteries and anterograde bilateral vertebral flow, and another off-site cardiology consultation was requested for Plaintiff to further discuss the results with Dr. Kumar.  (Doc. 423 ¶ 9.)

On July 29, 2019, Plaintiff was again seen by Defendant Igwe after returning from another offsite appointment; recommendations were noted for routine follow up every six months for ECG and blood pressure recommendations, and for the correctional facility to follow his blood pressure; Plaintiff indicated no distress and no concerns in that visit and his blood pressure was again controlled.  (*Id.* ¶ 10.)

On August 8, 2019, Defendant Igwe saw Plaintiff for a chronic care clinic, and at that time, Plaintiff's blood pressure was 162/120, but Mr. Tripati denied exertional chest pain or pressure, shortness of breath, orthopnea, paroxysmal, nocturnal dyspnea or lower extremity edema; Plaintiff reported that he was still having tremors.  (*Id.* ¶ 13.)  Defendant Igwe ordered labs to follow-up and a gluten-free diet, and she scheduled Plaintiff for a chronic care follow-up in three months; Defendant Igwe also noted the cardiologist had been seen and all testing/imaging as interpreted by the cardiologist indicated that Plaintiff had uncontrolled high blood pressure but no other recommendations that providers had not been following.  (*Id.*)

On August 20, 2019, Plaintiff had a consultation with PA Gawelko at Goldfield Cardiovascular due to an abnormal EKG.  (*Id.* ¶ 15.)  The office note indicated that Plaintiff's blood pressure was well controlled in the office on that date, and PA Gawelko stated there were no significant morphology changes compared to ECG tracing on file in April 2019 and no significant valvular disease or insufficiency; Plaintiff's carotid ultrasound showed normal right and left carotid arteries and no evidence for any reversible ischemia.  (*Id.*)  Plaintiff told PA Gawelko that he was concerned that his blood pressure continued to be uncontrolled while in the prison environment.  (*Id.* ¶ 16.)  PA Gawelko noted that a bilateral renal artery ultrasound may be warranted to investigate secondary

hypertension, as well as four readings of blood pressure per day for 10 to 14 days to help identify the time of day blood pressure was uncontrolled and then to have medication possibly adjusted after a lengthy blood pressure log was reviewed. (*Id.*) Gawelko further indicated that Prednisone could be contributing to Plaintiff's elevated blood pressure readings and should be compensated for if warranted; Gawelko also recommended repeat EKGs and cardiology follow up every 6-12 months and noted that Plaintiff may benefit from a GI or nutritionist consultations. (*Id.* ¶ 17.) Finally, a repeat echocardiogram was recommended in two years. (*Id.*)

Defendant Igwe reviewed the report and recommendations and agreed to all of the foregoing follow-up and testing, but she did not believe a GI consult was indicated at that time. (*Id.* ¶ 18.)

On September 5, 2019, Defendant Igwe requested an offsite renal artery ultrasound, and scheduled follow-up cardiology consults and EKG's every 6-12 months and an echocardiogram in 2 years; it was also noted that Mr. Tripati had not been on Prednisone because of its contribution to increased blood pressure, and that he had not been on it for years. (*Id.* ¶ 20.)

Plaintiff's blood pressure was checked three or four times per day on September 3, 4, 5, 6, 8, 10, 11, 15, 16, 17, 18, 22, 23, 24 and 25, 2019. (*Id.* ¶ 21.)

On October 11, 2019, Plaintiff underwent a duplex abdominal pelvic renal imaging study; Defendant Igwe reviewed the results, and there was no evidence of renal artery stenosis, no hydronephrosis, no ascites in abdomen and there was only an incidental finding of a renal cyst, which would be watched; Defendant Igwe notified Plaintiff. (*Id.* ¶ 22.)

Plaintiff was seen by PA Gawelko at Dr. Kumar's Office on September 14, 2020 for pre-procedure cardiology clearance prior to a renal artery angiogram, and it was recommended that Plaintiff complete the renal artery angiogram. (*Id.* ¶ 27.)

On October 12, 2020, a consultation at Cobra Valley Regional Medical Center for a cardiac angiogram showed: (1) normal abdominal aorta; (2) normal right and left renal arteries; and, (3) normal right and left lower extremity arteries. (*Id.* ¶ 28.) Thus, kidney

issues were ruled out as a cause of Plaintiff's hypertension; it was noted that Plaintiff may need management of provocative factors such as anxiety and to make behavioral modifications, including salt restrictions, which was discussed with Plaintiff.  (*Id.* ¶ 28.)

On October 15, 2020, a request for an offsite consultation appointment was made for Dr. Kumar to review the cardiac cath angiography tests; this follow-up appointment was approved and pending for Dr. Kumar's first available appointment in December 2020. (*Id.* ¶ 29.)[6]

### C. Discussion

The parties do not dispute, and the record supports, that Plaintiff's various medical conditions constitute serious medical needs.  Therefore, the Court must determine whether each Defendants' responses to Plaintiff's serious medical needs amounted to deliberate indifference.

On this record, the facts do not support a finding that Defendants Arhin, Igwe, Minev, Osinloye, Powell, Stewart, or Weigel were deliberately indifferent to Plaintiff's serious medical needs.  Plaintiff's medical records show that these Defendants consistently responded to Plaintiff's medical complaints, promptly scheduled appointments when appropriate, entered Plaintiff's prescription orders from the specialists, referred Plaintiff to the provider when necessary, and submitted consultation requests for Plaintiff to be seen by specialists.  Plaintiff's blood pressure medications were adjusted in response to his complaints, and he had several offsite consultations.  The recommendations of the specialists were consistently followed, and Plaintiff's blood pressure was consistently monitored.  There is no evidence in any of the medical records that Defendants deliberately disregarded Plaintiff's complaints or that their responses to Plaintiff's complaints were medically inappropriate.

Likewise, the record does not support an Eighth Amendment Claim against Defendants Corizon and Centurion.  To prevail on a claim against Corizon and Centurion as private entities serving a traditional public function, Plaintiff must meet the test

---

[6] Defendants moved for summary judgment on December 23, 2020. (Doc. 422.)

articulated in *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 690-94 (1978). *See also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities acting under color of state law). Accordingly, Plaintiff must show that an official policy or custom caused the constitutional violation. *Monell*, 436 U.S. at 694. To make this showing, he must demonstrate that (1) he was deprived of a constitutional right; (2) Corizon and/or Centurion had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). Further, if the policy or custom in question is an unwritten one, the plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

As discussed above, the record does not support an Eighth Amendment violation. Therefore, the first element of the *Monell* test has not been satisfied, and Plaintiff's claims against Defendants Corizon and Centurion must be dismissed. For the foregoing reasons summary judgment will be granted to Defendants Arhin, Igwe, Minev, Osinloye, Powell, Stewart, Weigel, Corizon, and Centurion, and they will be dismissed.

**IT IS ORDERED:**

(1)    Plaintiff's Rule 56(d) Motion (Doc. 351) is **denied**.

(2)    Plaintiff's Rule 11(c)(2) Motion (Doc. 369) is **denied**.

(3)    Plaintiff's Motion to Vacate (Doc. 383) is **denied**.

(4)    Plaintiff's "Notice in Support of Pending Matters" (Doc. 388) is **denied**.

(5)    Plaintiff's Motion for Expedited Decision on SDT and Discovery Conference-Motion to Stay (Doc. 411) is **denied**.

(6) Plaintiff's Motion to Review Documents (Doc. 414) is **denied**.

(7) Plaintiff's "Notice of Retaliatory Block" (Doc. 430), which the Court construes as a motion for injunctive relief, is **denied**.

(8) Plaintiff's Motion to File Delayed Motion (Doc. 431) is **denied**.

(9) Defendants Bohuszewicz and Young's Motion for Summary Judgment (Doc. 346), which Defendant Shuman joins (Doc. 403) is **granted**.

(10) Plaintiff's claims against Defendants Shuman, Bohuszewicz, and Young regarding his low-salt medical diet and retaliation are **dismissed** for failure to exhaust available administrative remedies.

(11) Defendants Defendants Arhin, Igwe, Minev, Osinloye, Powell, Stewart, Weigel, Corizon, and Centurion's Motions for Summary Judgment (Docs. 409, 422) are **granted**.

(12) Defendants Bohuszewicz, Young, Arhin, Igwe, Minev, Osinloye, Powell, Stewart, Weigel, Corizon, and Centurion are **dismissed** from the action.

(13) The only claim remaining in the action is Plaintiff's medical care claim against Defendant Shuman regarding blood pressure treatment.[7]

Dated this 4th day of February, 2021.

_____

Honorable Rosemary Márquez
United States District Judge

---

[7] Defendant Shuman's deadlines for filing summary judgment motions remain the same as stated in the Court's December 11, 2020 Order. (Doc. 413.)